BETZING, PLAINTIFF, *v.* BECKMAN ET AL., DEFENDANTS.

Common Pleas Court, Hamilton County.

No. A-189922. Decided September 26, 1963.

302

*Mr. Judson Hoy*, for plaintiff.

*Mr. Raymond E. Shannon*, prosecuting attorney, and *Mr. Raymond C. Wetherell*, assistant prosecuting attorney, for defendants.

RENNER, J.  Plaintiff, in this action for a declaratory judgment, is the owner of a triangular parcel of land lying to the

east of Winton Road, a county highway in Section 20, Town 3, Entire Range 1, Miami Purchase, Hamilton County, Ohio. The westerly line of plaintiff's property extends along the center line of Winton Road northeastwardly for a distance of 1000 feet. The east one-half of the present thirty foot paved roadway occupies the westerly fifteen feet of plaintiff's property.

This cause arose as a result of the proposed improvement and widening of Winton Road by the defendants to a width of forty feet which will entail the paving of an additional five foot strip along plaintiff's property.

In her petition the plaintiff alleges that she is the owner of the property referred to above and that Winton Road is a paved county road thirty feet in width, fifteen feet of which runs over the westerly fifteen feet of her real estate. She further alleges that the county commissioners plan to improve and widen the paving of Winton Road without instituting appropriation proceedings against her; that Winton Road where it borders plaintiff's property is not sixty-six feet in width as claimed by the county commissioners and the proposed widening of the paving would include an additional five foot wide strip of her property lying immediately east of the present paved roadway. Plaintiff further alleges that if it is determined that Winton Road is, or was, a county road sixty-six feet in width, the paved portion of Winton Road as it now exists is not within the sixty-six foot right-of-way and that the sixty-six foot right-of-way has been vacated by operation of law. The prayer of the petition asks the Court to declare the rights of the parties in Winton Road and to specifically declare the width and location of such right-of-way in relation to plaintiff's property.

The answer of the county commissioners admits plaintiff's ownership of the premises, subject to the rights of the public in Winton Road and admits that they plan to improve Winton Road, and to widen it by adding five additional feet of paving on each side of the present thirty foot paved roadway. The answer then alleges that Winton Road consists of a sixty-six foot right-of-way, the center line of which coincides with the northwesterly line of plaintiff's property, and that the defendant's are not appropriating any of plaintiff's property for

304

the contemplated improvement. The commissioners then pray the Court to find Winton Road to be a public highway sixty-six feet in width, the center line of which coincides with the northwesterly line of plaintiff's property.

All of the evidence in this case is contained in an eight page agreed statement of facts and twenty-nine exhibits which were submitted as a part of the statement of facts.

Counsel for the county commissioners contend that the public acquired the right of use and enjoyment of Winton Road as a sixty-six foot roadway by judicial proceedings instituted in 1798, wherein the court ordered the original highway to be opened and established as a public highway of the county four poles wide, pursuant to the provisions of the first road law of the Northwest Territory, enacted August 1, 1792. Counsel for the commissioners further contends that subsequent proceedings, instituted in 1817, altering the location of the part of that original right-of-way of Winton Road, lying north of North Bend Road, did not lessen the public's existing rights to a sixty-six foot right-of-way. Plaintiff's property is located on Winton Road north of North Bend Road in the area affected by that alteration.

Counsel for plaintiff, however, contends that the first road law of 1792 was void ab in itio because the initial legislative body, in the enactment of that law, exceeded the authority granted to it by section 5 of the Ordinance of 1787 and that, in the absence of such road law, the court was without authority to establish and open Winton Road and that whatever right the public has for roadway purposes is limited to the thirty foot width of the existing paving, such right having been acquired by prescription only.

Counsel for plaintiff contends further that even though the first highway law should be found to be a valid enactment, the evidence which has been presented in support of the defendants' position is insufficient to establish Winton Road as being wider than thirty feet, which the public acquired by prescription only.

In question, basically, is the validity of the legislative, judicial, and administrative actions by which government, exercising its inherent right of eminent domain, established Winton Road.

The first question to be resolved is the validity of the first road law of 1792. Its validity is dependent on what construction is made of the Ordinance of 1787, and particularly section 5 thereof. Neither counsel for plaintiff nor counsel for defendant have cited any reported cases or judicial decisions on this important initial issue, and I have found none. Counsel for plaintiff relies solely upon the opinions of two individuals namely, Governor Arthur St. Clair and George A. Edge.

The Ordinance of 1787 retained for the Congress of the United States full sovereignty over "the territories of the United States northwest of the rivers Ohio." The governor was to be *appointed* by the *Congress*, commissioned for three years, unless his commission be sooner *revoked by Congress*. A court of three judges was to be *appointed by Congress*, their commissions to continue in force *during good behavior*. These officials then must be regarded as agents of the Congress, their duties defined and their authority limited by Congress, their terms of service at the pleasure of Congress. Their official acts, if in conformity with the expressed will of Congress, would have the weight of the authority of the Congress itself. Such laws were to remain in force until the organization of the territorial general assembly, unless disapproved by Congress. The five members of the legislative council were also subject *to removal by Congress*.

Next to be considered is how much of its legislative authority did the sovereign Congress delegate to its agents, the governor and three appointed judges, "or a majority of them." In the words of the Ordinance, section 5, they were authorized to "adopt and publish * * * such laws of the original States, * * * necessary, and best suited to the circumstances of the district."

The operative word here is *adopt*. Its meaning in the Ordinance, an expression of the will of Congress, has been considered and debated innumerable times, from the enactment of the Ordinance of 1787 to the present time.

Among the first, if not the first, to question its meaning, was the first appointed governor for the Territory, General Arthur St. Clair, himself. The governor was strongly inclined to the conservative view, that the Congress meant to deny to

the governor and judges in their legislative capacity authority to initiate any new laws, and so to restrict them to the adoption and publishing only of such existing laws of the original States as may be deemed applicable.

The St. Clair Papers, volume 2, contains a number of his addresses and letters, which are most informative on the question presented herein. Typical of his public and private expressions on the subject is the following quotation from his remarks when the territorial government was established at Marietta, on July 9, 1788:

"You will observe, gentlemen, that the system which has been formed for this country, and is now to take effect, is temporary only, suited to your infant situation, and to continue no longer than that state of infancy shall last. During that period, the judges, with my assistance, are to select from the codes of the mother States such laws as may be thought proper for you. This is a very important part of our duty, and will be attended to with the greatest care. But Congress have not intrusted this great business wholly to our prudence or discretion; and here again you have a fresh proof of their paternal attention. We are bound to report to them all laws which shall be introduced, and they have reserved to themselves the power of annulling them, so that if any law not proper in itself, or not suited to your circumstances, either from our not seeing the whole extent of its operation, or any other circumstance should be imposed, it will be immediately repealed." St. Clair Papers, volume 2, pp. 54, 55.

The sharp differences of opinion between Governor St. Clair and Judges Parsons and Varnum, two of the three judges who served with him as legislators, led to long altercation between them. St. Clair Papers, volume 2, p. 356. The lengthy correspondence between the governor and these judges is found in volume 2, The St. Clair Papers, pp. 64 to 78. The judges' position is well illustrated by the following remarks in their letter to the governor, dated July 31, 1788:

"The Ordinance of Congress empowers us to adopt such laws of the original States, criminal and civil, as may be necessary, and best suited to the circumstances of the district. Admitting a strict and literal construction should be given to this

clause, the purposes of the Ordinance in general would be defeated. In the settlement of a new colony, and, indeed, we may add, of a new world, a variety of prospects and objects arise, to which old countries must be strangers. Perhaps in their infancy their laws might have been suited to our situation, making allowance, however, for the progress of civil society; but the original States have revised their laws, and conformed their present codes to their present situation. Hence, it will be found that it would be out of our power to make the absolutely necessary regulations for protecting the persons and securing the property of the natives, and for preventing those unwarrantable intercourses, which might perpetuate their jealousies instead of conciliating their affections. There are ties, connections and subordinations in the nature of a colonial government, which did not exist in sovereign States. Laws must be applied to these, or the very existence of the government may be endangered." * * * If the clause in question admits of different constructions, we ought to adopt that which will best promote the purposes of the settlement." St. Clair Papers, volume 2, pp. 69, 70.

From the time that the legislative body convened for its first session in 1788 and until 1791, Governor St. Clair and the judges passed a number of laws that were not selected from the codes of the mother states. The governor said he found himself, in some measure forced to do this, because he was unable to convince Judges Parsons and Varnum of the impropriety of such enactments. St. Clair Papers, volume 2, p. 357.

In addition to not exercising its veto power, which was retained by it in Section 5 of the Ordinance, Congress, on May 8, 1792, enacted a law, which in effect expressly approved all territorial laws which were by then enacted. Section 1 of that statute provides:

"That the laws of the territory northwest of the Ohio, that have been, or hereafter maybe, *enacted* by the governor and judges thereof, shall be printed, under the direction of the secretary of state, and two hundred copies thereof, together with ten sets of the laws of the United States, shall be delivered to the governor and judges, to be distributed among the inhabitants, for their information, and that a like number of the laws of the

United States shall be delivered to the governors and judges of the territory southwest of the river Ohio." (Emphasis added.)

Three months after this congressional action the territorial legislature met at Cincinnati, and on August 1, 1792, enacted the first law, authorizing the opening and regulation of highways in the Northwest Territory. Laws of Governor and Judges Northwest Territory, 1792, p. 21. It was one of thirteen laws enacted at that session, all of which were enacted independently of the laws of the states. Winthrop Sargent, the first secretary, appointed by Congress for the Northwest Territory, acted for Governor St. Clair, who was absent from this session. The secretary of the territory was authorized and required, by act of Congress, passed August 7, 1789, to execute and perform all of the powers of the governor, during the vacancy occasioned by his removal, death, or necessary vacancy.

Except for the fact that counsel for plaintiff relies upon the remarks of Governor St. Clair made at a later date on May 27, 1795, there would be no reason to further comment on this issue. On that occasion two of the three judges met in legislative session at Cincinnati with the governor. The quoted remarks which counsel cites are a part of his address to the judges. They relate to a bill which the House of Representatives had passed at the last session of Congress. This house bill disapproved all of the laws of the Northwest Territory enacted at Cincinnati from July to December 1792. Governor St. Clair said he was informed that the House took this action because in its opinion the Governor and judges had no power to make laws, their authority being limited to adoptions of laws of the States. He informed the judges that the Senate did not agree with the House, and that consequently the bill did not become a law. St. Clair Papers, volume 2, p. 356.

After this indirect affirmation by the Senate of their authority, Governor St. Clair requested, and the judges joined with him in the repeal of a number of enacted laws, and in lieu thereof, they adopted new laws from the statutes of the States. But significantly, the highway law of August 1, 1792, was not repealed, other than the part which related to bridge construction. Laws of Northwest Territory, 1795, p. 178.

Governor St. Clair's continuing obduracy was again illustrated in his address to the general assembly for the Northwest Territory in the fall of 1799. To support his request for legislative action on the laws that were not adopted from the State, he advised the general assembly that judges from the bench expressed doubt as to the validity of such enactments. St. Clair Papers, volume 2, p. 446. But on this, as on other occasions, he did not name any judge or any case where this question was directly or indirectly before the court.

At that session, on October 28, 1799, at the request of the governor the general assembly, passed an act confirming the giving force to certain laws which the governor and judges had enacted on their own authority. Laws of the General Assembly Northwest Territory, 1799, p. 24. This act declared the "act for opening and regulating highways, passed the first day of August, one thousand seven hundred and ninety two, excepting so much there of as relates to bridges," together with others, to be in force within the territory as fully and completely as though they were recited at length and reenacted. Section 3 of the act validated every judicial act, and all other acts and proceedings which were had under and by virtue of the earlier laws as though such laws had been adopted conformably to the Ordinance of 1787.

When Ohio reached statehood, all rights, including road rights, acquired or established under the laws of the Northwest Territory, were guaranteed by section 1, of the Schedule in the Constitution of 1802, which provided:

"That no evils or inconveniences may arise, from the change of a territorial government to a permanent state government, it is declared by this convention, that all rights, suits, actions, prosecutions, claims and contracts, both as it respects individuals and bodies corporate, shall continue, as if no change had taken place in this government."

Similar provisions are also found in section 1 of the Schedule in the Constitution of Ohio 1851.

The only other person whom counsel for plaintiff relies on as an authority on early road legislation in Ohio is George A. Edge of the Legislative Reference Department. Mr. Edge was chosen to write the introductory article entitled "A Review of

Road Legislation in Ohio," appearing in Ohio Road Laws, 1915. This book was compiled by his department and was published by the Board of Library Commissioners of Ohio.

Mr. Edge apparently did not comprehend the reasoning of Governor St. Clair and the territorial judges in their debating the question of their authority to enact laws independently of the state statutes, and supporing his presumptuous and unequivocal statement that "this first road law was clearly invalid," he lists specious and erroneous interpretations of the Ordinance of 1787. First, he states, that the Ordinance of 1787, limited the authority of the governor and judges to adoptions of laws of the original states but gave them no power to enact laws. Second, he states, that the 1792 road law was passed and signed by the secretary of the governor instead of the governor himself. He apparently did not know that it was Winthrop Sargent, the first secretary of the Northwest Territory, appointed by Congress and not a secretary of the governor who with the two judges enacted all of the laws of 1792; and that Congress, by the Act of August 7, 1789, had authorized and required the secretary of the territory to act for the governor during his absence.

In conclusion I find that the first road law enacted August 1, 1792, was a valid enactment, and, except for section 8 relating to bridges, it continued in force and effect until it was repealed by the new territorial road law, passed by the first general assembly for the Northwest Territory which became effective on January 1, 1800.

The remaining issue to be determined is the width of the public right-of-way, for road purposes, over plaintiff's property. All of the evidence in the agreed statement of facts and the 29 exhibits, submitted jointly by both parties, relates to this question.

The only direct evidence in support of defendants' contention that Winton Road, where it passes plaintiff's property, is a 66 foot public highway, consists of copies of three official orders relating to the establishment and opening of Winton Road. These documents were found in a book entitled "Road Records, 1793-1850," in the office of the Hamilton County Engineer and they read as follows:

*Page 158*                    *1798*
*"Road from Goudy's Mill to Winton's plantation.*

"Be it remembered that at this present sessions of May aforesaid pursuant to an order of Court on a petition of more than twelve citizens of the County aforesaid for a road or public highway in the said County from Goudy's Mill on Mill Creek, thence through Lands of Luther Kitchell, Isaac Spinning., Col. Oliver Spencer, & c., and thence to the great road leading from Cincinnati to Fort Hamilton near the house of Mathew Winton, the following Survey of a road in the County aforesaid by Henry Weaver, Surveyor, Isaac Spinning, and Mathew Winton, assistants, was made and reported, to-wit: Beginning at the great road leading from Cincinnati to Fort Hamilton near Goudy's Mill, thence North fifty three chains and fifty links, thence North eight degrees East twenty-six chains and fifty links, thence North eighteen degrees West ten chains, thence North forty degrees East fourteen chains and fifty links, thence North twenty-five degrees East eleven chains, North forty-four degrees East three chains and fifty links, thence North thirty-five degrees West twenty-one chains, thence, the same course, to-wit: North thirty-five degrees West eighteen chains, thence North twenty degrees East fifteen chains, thence North ten degrees West sixty-seven chains, thence North ten degrees East one hundred and sixty chains, thence North seven degrees eighty chains, etc. making in the whole distance six miles. Whereupon all and singular the premises being seen by the Justices here and fully understood, it is ordered according to the statute of the Territory in such case lately made and provided that the foregoing Survey be established as a public highway of the County aforesaid, four poles wide, and that the same be opened, etc. by the Court."

*Page 180*                    *1800*
*"Alteration of road from Goudy's Mill to Hamilton.*

"Be it remembered that pursuant to an order of Court for a review and alteration of the road from Goudy's Mill to Hamilton as to its passage through David McCash's land, report being made that the alteration of the road is on good ground, it is ordered that the same be established as a public highway four poles wide, and that the same be opened, etc."

*Page 79*                    *1817*
*"RECORD of an alteration in the Winton Road.*

"Beginning at a stake in the line between Joseph Carpenter and John Jones and in the road leading from Columbia to North Bend thence North 14 ½ W. 42 poles N. 12 W. 40 poles N. 24 ½ E. 70 poles N. 14 E. 20 poles N. 1 ¼° E. 160 poles N. 7 ½ W. 44 poles N. 3° E. 108 poles N. 23° E. 48 poles N. 40 W. 140 poles N. 7 E. 40 poles thence with a section line N. ½° W. 170 poles to a stake near a school house thence N. 31 ½ W. 49 poles to a stake on the South side of a well thence N. 25 ½ W. 46 poles N. 23 W. 60 poles N. 8 ½ W. 58 poles N. 7 ½ W. 60 poles to a stake nearly opposite A. Lindleys House thence N. 4 ¼ W. 30 poles N. 4 ½ E. 28 poles N. 8 ½ W. 38 poles to the top of Mill Creek Hill N. 50 W. 28 poles N. 51 W. 16 poles N. 85 ½ W. 20 poles crossing Creek at 6 poles N. 48 W. 18 poles N. 35 ½ W. 48 poles N. 55 W. 70 poles N. 30 ½ W. 22 poles N. 33 ½ W. 73 poles North 301 poles N. 57 ½ W. 70 poles West 30 poles No. 40 W. 108 poles N. 59 W. 62 poles N. 38 W. 100 N. 57 W. 36 poles N. 33 W. 104 poles N. 4 ½ W. 64 poles N. 8 W. 54 poles N. 19 ½ W. 22 poles North 29 W. 52 poles North 56 poles to a stake about 25 feet west of a section corner in the line of Hamilton and Butler Counties and near the Baptist meeting house having set a post at the termination of each mile viewed and surveyed by John R. Gaston, Samuel Hill and Abierzer Miles, viewers, and Joe Wright Jun Surveyor on the     of June and established by the Commissioners on the 29th of July, 1817."

The first of the above orders was made in 1798 by a territorial justice while the first road law of August 1, 1792, supra, was in force and effect. This law did not specify any maximum or minimum width.

The second order of 1800, altering Winton Road, was made by a territorial court. The law then in force and effect governing such proceedings was approved December 13, 1799, and became effective January 1, 1800. Laws of N. W. Ter. Vol. 1, p. 162. This law provided a maximum width of 66 feet.

The alteration of Winton Road in 1817 was ordered by the county commissioners under the provisions of a law of the State of Ohio which was passed February 16, 1816, and became effective May 1, 1816. Laws of Ohio, vol. 14, p. 223.

I must again emphasize what I noted earlier, this statute limited the width to a maximum of 60 feet.

Counsel for plaintiff contends that these three orders of the judges and the county commissioners and the plats, deeds and other collateral evidence fail to sustain defendants' claim that Winton Road is a public highway sixty-six feet in width.

The first reason he assigns for this is that the roadway, as described in the original court order of 1798, is so general that it fails to show that the present thirty foot roadway is within the sixty-six foot roadway described in that original court order.

The only plat of Winton Road, from its southern terminus, at Spring Grove Avenue, to its northern terminus at the Hamilton-Butler County line, is a photostatic copy of the road taken from an 1869 Atlas of this section of Hamilton County, exhibit 24. No courses or distances are shown on this plat and there is no overlay plat showing the location of the road described in the order of 1798, nor is there any other evidence to sustain this first contention of counsel for plaintiff.

Counsel for plaintiff further contends that the order of court in 1800 has no probative value because the section of Winton Road altered by that order does not border plaintiff's property. This alteration related to the road as it passed through David McCash's land, located approximately one-seventh of a mile north of the property now owned by plaintiff.

It should here be emphasized that the section of road passing through David McCash's land and the nearby section of road bordering plaintiff's land were both included in the 1817 alteration.

The fact that the McCash section, where altered, was ordered to have a width of sixty-six feet the same width as the original road established in 1798, is supporting evidence of defendants' contention that Winton Road has always been and now is a sixty-six foot roadway.

Counsel for plaintiff also contends that the court order of 1817 lacks probative value in that Winton Road, as it now exists, is not in the location of the road described and authorized by that order. Conceding that the right-of-way defined by distances and compass bearings in 1817, when platted, generally coincides with the location of the present Winton Road

northward from North Bend Road to a point several hundred feet south of plaintiff's property, he then shows that from that point north the ninth compass bearing and distance given as "N. 40 W. 140 poles" would place the road to the west of its present location, and several hundred feet west of plaintiff's property.

A plat, in evidence as Exhibit No. 23, clearly shows this variance and confirms, that, had the bearing of "N. 40 W. 140 poles" been followed, then Winton Road in this portion would have been located to the west of the existing road at a distance averaging approximately one-half mile. But this same exhibit 23 identifies three monuments near where stakes were set at the time the survey was made in 1817, which confirm that, correctly, the ninth compass bearing was N. 40 E. 140 poles, and indicates that there was error in recording during proceedings or in later transcriptions. The three monuments, Liberty School located in Section 15, A. Lindley's land in Section 22, and the Baptist Meeting House located in the northeast corner of Section 25 at the Hamilton-Butler county line, are confirmed in their respective locations by deeds to the property owners, in evidence as Exhibits Nos. 7, 10, 11 and 15. These last mentioned exhibits and Exhibit No. 23 show, conclusively, that the ninth course and distance must have been north forty degrees east one hundred forty poles and that the error occurred either during the proceedings or when the description was copied at a later time.

The rule is well established in Ohio that a misdescription in one or more particulars is of no consequence if the residue of the description enables the court to correct the error and ascertain the land. *Eggleston* v. *Bradford*, 10 Ohio, 312 at 316; *Williams* v. *Sparks*, 24 Ohio St., 141.

It is also well established in Ohio law that when inconsistencies arise in descriptions, resort is to be had first to natural objects or landmarks, next to artificial monuments, then to adjoiners, then to courses and distances, and lastly to quantity. 7 Ohio Jurisprudence (2d), 637, section 30.

Another inconsistency, upon which counsel for plaintiff relies, appears in the 1817 order of alteration which directs that one course of the road "run with a section line, 170 poles to a

stake near a school house." Counsel for plaintiff states that existing Winton Road at no point runs with or even within several hundred feet of a section line.

Two plats, exhibits 28 and 29, relating to the location of Winton Road, as modified in 1817, present additional significant evidence pertaining to the adequacy of the 1817 description of the altered road. Counsel have stipulated in the agreed statement of facts that exhibit 28 is an overlay plat of the improvement of Winton Road in 1930 and that exhibit 29 is an overlay plat of Winton Road as it was altered in 1817. As portrayed on the plat (exhibit 29) the ninth course which had read "N. 40 W. 140 poles" in the court order of 1817, apparently has been changed by the draftsman to a course bearing N. 40 E. 140 poles.

Both of these plats are drawn on transparent paper to a scale of 1 inch to 200 feet, and when one of the plats is superimposed upon the other the two roads are shown to occupy, in general, the same sixty-six foot wide strip of land from North Bend Road north to West Compton Road. The greatest variance in the plats is shown at an indicated turn in the road a short distance north of the north line of the Betzing property. Here the plat of 1817 shows the roadway, along the Betzing property, as coursing more to the east than the roadway as improved in 1930. The greatest difference in the platted alignments is immediately north of plaintiff's property, but at this point the roads, as platted, are not entirely separated. In this instance the above rules of law, relating to misdescriptions and inconsistencies, are equally applicable.

The concluding reason that counsel for plaintiff assigned in support of his contention, that the public use of Winton Road is limited to 30 feet, relates to the proceedings of the county commissioners altering the original Winton Road in 1817. He contends that because the description was by line only and because the width was not specified in the partial record of the alteration, that therefore, there is no evidence before the court to supports defendants' claim to a sixty-six foot public right-of-way. He then cites five Ohio cases in support of this contention.

The first case is *Hernik et al* v. *Director of Highways et al,*

316

169 Ohio St., 403, 8 Ohio Opinions (2d), 438. The facts in that case are fundamentally different from the facts in the instant case. That case involved U. S. Route 42 which, prior to the controversy, had been improved to a width of forty feet. The director of highways had proceeded to improve and widen the road to a width of sixty-six feet which he claimed was the extent of the right-of-way to which the state was entitled. The Supreme Court sustained the Court of Appeals which had held that the state had a sixty-six foot right-of-way. The Supreme Court, in its opinion, states that on the trial of the action no documentary evidence was presented to establish the nature or extent of the right of way acquired by the state when the road was originally laid out. The court found the road to be sixty-six feet wide by reason of the provisions of the laws of the State of Ohio then in effect. That law related to the three percent roads and it provided that three percent roads were to be established sixty-six feet wide. In the instant case there is documentary evidence that the right-of-way of Winton Road was established as a sixty-six foot public road in 1798. Such documentary evidence was lacking in the *Hernik case.*

The next case cited is *Broadsword* v. *Kauer, Director*, 161 Ohio St., 524, 53 Ohio Opinions, 395. In that case the Supreme Court did nothing more than to declare the width of the two highways in question to be the width that had been established initially. In syllabus paragraph 3, the court emphasizes the fact that the two highways were created by proper legal proceedings which established the width as fifty and sixty feet respectively.

Still another case cited by counsel for plaintff is *Beckwith* v. *Beckwith et al*, 22 Ohio St., 180. This case involved the boundaries of a road which was laid out and opened in 1811. The original survey ran a single line, which line was designated as the north boundary of the road. Later in 1861 and 1867, surveys were made in an attempt to shift the road northwardly thirty feet, using the originally designated north line as the center line of such road. The Supreme Court held that in so shifting the road the county surveyor had exceeded the authority vested in him and, therefore, the public had gained no rights north of the original line described in the survey of 1811.

In Ohio a single line description of a road has been recognized as measuring the center line, except where the line is designated as other than a center line.

A fourth case cited by counsel for plaintiff is *City of Wilmington* v. *Buckley*, 86 Ohio App., 117, 40 Ohio Opinions, 519. This case is likewise not in point. In a closing paragraph the court stated "We find so many contradictions in the various documents as to courses and distances that the only effect produced is one of bafflement. The mind is not inclined to any certain course." The court then concluded that the plaintiff failed to sustain the burden of proof.

The last case cited by counsel for plaintiff *Ludlow* v. *Dies*, 19 C. C., 717, is likewise not applicable to the instant case. In that case there was no record or other proof showing where or how North Bend Road was established or opened. There was evidence before the court that North Bend Road had been lined by fences, which were separated by the roadway, for an average width of 40 feet. It was upon this evidence that the court held the road to be 40 feet wide and not 60 feet in width as claimed by the county commissioners.

I do not consider the facts in any of these cases sufficiently similar to the facts in the instant case to regard any of them as decisive of the issues presented here.

Counsel for defendants cite *City of Gallipolis* v. *The Gallia County Fair Company*, 34 Ohio App., 116, in support of the county commissioners' claim to a sixty-six foot public right-of-way in Winton Road. In that case at page 121 the court stated that evidence showing a road to be sixty-six feet in width on either side of a part of the road the width of which had not been previously established, raised a slight inference that the road was established along such part for the same width of sixty-six feet.

The road records of Hamilton and Butler counties were submitted as evidence by counsel for both of the parties, but, as previously indicated herein, counsel for plaintiff contends that these road records lack probative value. In a number of cases the courts have upheld similar proceedings of inferior tribunals and county commissioners.

The following is the opinion in one of the cases, 5 Ohio, 271, *Arnold* v. *Flattery*:

318

"Where a road has been laid out in the manner prescribed by law, opened and used many years, it can not be allowed that it shall be suddenly closed by any individual through whose land it passes, on the hypothesis that the road used does not exactly follow the courses and distances of the recorded survey. Nor can it be required, after the lapse of many years, that to sustain a public road every preliminary step directed to be taken in establishing it must be proven by existing papers or records. In this case the court admitted the record and parol proof of the opening and using the road. The record was admitted to establish the fact that the road had been applied for and ordered; the proof of the opening and use, to show where it was actually opened and used. We think that in this there was no error. A new trial must be refused."

The other cases are 3 Ohio, 231, *Harding* v. *Trustees, etc.*; 13 Ohio St., 406, *Beebe* v. *Scheidt*; 28 Ohio St., 488, *McClelland* v. *Miller*.

The statute in effect when Winton Road was modified by the county commissioners in 1817, 14 Ohio Laws, 223, provided that "all roads and highways established by law, shall be opened, amended, and kept in repair, or vacated agreeably to the provisions of this act; etc." Section 5 of this statute provides "and if no objections are made to such proposed road on the second reading, and the commissioners are satisfied that the same will be of public utility, they shall order such road to be opened a necessary width, not exceeding sixty feet, and made in other respects convenient for the passage of travelers and carriages, and cause a record thereof to be made, which road thenceforth shall be deemed a public highway."

It is obvious, that in original proceedings to establish and open a road not already established, it would be necessary to specify the width to which the road was to be opened. But it does not follow that in proceedings to "amend" a road of established width,—even if such alteration should change the course of the road,—that such proceedings must redesignate that the altered section of the road be of the same width as the original road. However, if an alteration of an existing road were to be increased or decreased in width from the established width, then it would be necessary that such variation be provided for in the order altering the original road.

In evidence, as exhibit No. 27 is the official action of the Butler county commissioners, at their 1817 session, pertaining to the extension of Winton Road in Butler county. This extension was aligned with Winton Road in Hamilton county, and was established at a specified width of sixty-six feet. This action of the county commissioners, which was contemporaneous with that of the Hamilton county Commissioners constitutes collateral evidence of an intention on the part of the officials of the two adjoining counties, jointly, to undertake to establish the road in both counties at the maximum width provided by the statute then in effect.

In view of this collateral evidence and the other direct evidence previously considered, it would be illogical for this court, one hundred and forty-six years later, to infer that the responsible Hamilton county commissioners at that time would authorize an alteration of an intermediate section of Winton Road at a lesser width. In the absence of evidence showing an intention on the part of the Hamilton county commissioners in 1817 to decrease the originally established width of Winton Road it will be presumed that the Hamilton county commissioners, responsible for providing adequate road facilities, intended to and did establish the 1817 alteration of Winton Road at the maximum width provided by law. As previously stated the law which was in effect at that time limited the maximum width of Winton Road, as altered in 1817 to sixty feet.

Pertinent to this assumption, I quote from page 422 of the opinion in *Hernik* v. *Director of Highways, supra*:

"From what we have said, it is apparent that to assume that the road in the instant case was laid out to a width of less than sixty-six feet, regardless of the extent to which it was opened, would be to presume that the public officials upon whose shoulders rested the responsibility of bringing it into existence *according to the law as it read at the time* failed in their duty. Courts should not and do not indulge in such presumptions. In fact, the usual presumption is that a public official has done his duty according to law; and, in the absence of proof to the contrary in addition to mere occupancy, it will be conclusively presumed that the road here under consideration was laid out in accordance with law, i. e., that the state acquired either title

to or an easement of way over (the distinction being immaterial to the question herein) a strip of land sixty-six feet in width at the time it was laid out.''

and also from the opinion in *Lewis et al* v. *Laylin et al*, 46 Ohio St., 663, the Supreme Court of Ohio, at page 666, adopted and applied the following principles in construing the record of the county commissioners in that case:

''In determining the sufficiency of the records of inferior tribunals and public boards, to express their purposes or to preserve a memorial of their transactions respecting matters within their jurisdiction, technical precision should not be required; on the contrary, they should be liberally construed. They are not usually drawn by persons possessed of professional knowledge or skill in such matters; the law does not contemplate that such tribunals or boards shall be constantly attended by persons having such knowledge or skill, but rather, that their duties will be performed, at least, generally, without such assistance. To subject them to the test of technical precision, would, in most instances, at least, defeat the object sought to be attained by the legislature in creating inferior tribunals and public boards; and, therefore, however informal their records may be, if enough appears to show with reasonable certainty that the requirements of the law have been substantially complied with, their proceedings should, upon grounds of public policy, if for no other reason, be sustained.''

In conclusion I find from all of the evidence that the public has a right to the use and enjoyment of an easement for roadway purposes in the portion of Winton Road extending northwardly from plaintiff's southerly line to plaintiff's northerly line, approximately 1000 feet in length and at a uniform width of 30 feet eastwardly from the center line of the present paved portion of Winton Road; that the center line of the present paved portion of the road is also the center line of the roadway which was established and opened in 1817, by order of the Hamilton county commissioners, and that the defendants have the right to extend the width of the road eastwardly onto plaintiff's property to a maximum width of 30 feet from the center line of the present paved portion of the road.